# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-30053

United States Court of Appeals
Fifth Circuit

**FILED**

November 5, 2014

Lyle W. Cayce
Clerk

THOMAS E. ROQUE,

Plaintiff—Appellant

v.

NATCHITOCHES PARISH SCHOOL BOARD,

Defendant—Appellee

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 1:12-CV-3149

Before JOLLY and JONES, Circuit Judges, and AFRICK, District Judge.[*]

PER CURIAM:[**]

Plaintiff-Appellant Thomas E. Roque appeals the dismissal on summary judgment of his lawsuit alleging claims of race-based discrimination in connection with the selection of a school superintendent. We review a grant of summary judgment *de novo*, applying the same standard as the district court, and we construe the evidence and make all

---

[*] District Judge for the Eastern District of Louisiana, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-30053

reasonable inferences in favor of Roque. *E.g.*, *Boyett v. Redland Ins. Co.*, 741 F.3d 604, 606 (5th Cir. 2014).

The district court concluded that Roque failed to raise a fact dispute at the pretext stage of the *McDonnell Douglas* burden-shifting analysis. After reviewing the parties' briefs, oral argument, and the record, including the evidence of Hildebrand's comment that the school district was not ready for a minority superintendent, her alleged influence over the selection process, and her role in reopening the applications period for additional candidates, we conclude that Roque produced sufficient evidence to defeat summary judgment. Accordingly, the judgment of the district court is

VACATED     and     REMANDED     for     further     proceedings.

No. 14-30053

E. GRADY JOLLY, Circuit Judge, concurring:

Although I concur in the result the panel reaches, I take this opportunity to make a few observations. As a matter of caution, there are certain requirements that, while precluding summary judgment, do not impress me as pellucid. While this means that Roque has the opportunity to now build a case worthy of presentation to the jury, he should not expect that he can rest solely upon this evidence at trial and sustain a defensible verdict in his favor.

I.

A disparate treatment claim brought under Title VII must be premised on an adverse employment action. *Raj v. La. State Univ.*, 714 F.3d 322, 330–31 (5th Cir. 2013). Roque identifies the adverse employment action against him as his non-selection for the superintendent position. The Board took this adverse action when it voted, on a racially divided vote of 7–4, to select Derwood Duke as superintendent instead of Roque. As Roque acknowledged at oral argument, his evidence of discrimination by the *Board* depends upon the comments and actions of member Julia Hildebrand. According to Roque, Hildebrand harbored racist views, and she, in turn, influenced the other white members of the Board to vote against Roque.

Thus, Roque must rely on a cat's paw theory of discrimination in order to succeed on his claim against the Board. The cat's paw theory applies if the plaintiff can establish: "(1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker 'possessed leverage, or exerted influence, over the titular decisionmaker.'" *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004) (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000)). Roque has presented little evidence to support each element.

No. 14-30053

II.

A.

Turning to the animus requirement, I make two points on the relevant law.  First, any comments or behavior regarding a protected class must actually rise to a level that demonstrates *animus*.  While we have not precisely defined the term, *Webster's Dictionary* provides an instructive definition, defining animus as "ill will, antagonism, or hostility, usu[ally] controlled but deep-seated and sometimes virulent."  *Webster's Third New Dictionary of the English Language Unabridged* 86 (Philip Babcock Gove ed., 1993).  These definitions underscore that animus requires evidence of a substantial, deeply held prejudice.  Second, we have always phrased the test such that the plaintiff must demonstrate that the *particular employee* wielding influence over the decisionmaker held the required animus.  *See Roberson*, 373 F.3d at 653; *see also Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002) (noting in the retaliation context that a cat's paw claim is satisfied if the decisionmaker is influenced by "those who were acting from retaliatory motives").

Roque relies heavily on an allegedly discriminatory comment from Hildebrand drawn from two secondhand accounts.  Board member Ralph Wilson testified that Hildebrand remarked during the superintendent search:

> I just don't believe that the system in our area is ready for a minority.  I have nothing against the minorities, but I don't think that they are.  And she said, definitely—she pounded right there, and she definitely—she said to me, definitely not Tommy Roque.

Additionally, Board member Joella Wilson testified that "I can recall being at a meeting and, you know, she's saying that she didn't feel that the community was ready for a black superintendent."  When these two statements are read in context, Hildebrand is clearly referring to the

potential animus of *other* individuals in the community and not herself.[1] Roque acknowledged in his brief that her statement pertained to whether the *community* would accept an African-American superintendent. Hildebrand herself clarified that *she* did not harbor any personal animosity toward minorities. At most Hildebrand was suggesting that selecting a minority superintendent might be viewed negatively by some members of the Natchitoches Parish community and that Roque might be a particularly unpopular choice.

In an unpublished decision a panel of this Court rejected the theory that an employee's statements about the racial animosity of *others* could suggest that the employee *making the statement* harbored any racial animosity. *Phillips v. TXU Corp.*, 194 F. App'x 221 (5th Cir. 2006). In *Phillips*, the plaintiff was fired after Duane Lock, her supervisor, had scored her lowest on an assessment. Lock had previously told the plaintiff that another employee in the company, Jim Hess, "did not like aggressive women but especially not aggressive black women." 194 F. App'x at 223 (internal quotation marks omitted). On another occasion, the plaintiff told someone at the company that she felt like she had "stepped back in time" when she came to work there, and Lock told her to avoid making those types of statements. *Id.* The panel in *Phillips* concluded that these statements were not enough, noting: "Lock's remark about Hess suggests that Hess held the discriminatory animus, not the speaker. As it was Lock who was responsible

---

[1] Roque also references an alleged conversation at a public event where Hildebrand purportedly suggested that the Board would not hire a person of color. Ralph Wilson claimed at his deposition that an unnamed employee had sent an email indicating that Hildebrand made such remarks. The district court excluded this statement as hearsay, and I do not see how this statement presents competent summary judgment evidence. Ralph Wilson himself acknowledged that it would be unfair to attribute this remark to Hildebrand. This vague allegation does not identify a specific date on which Hildebrand made the comment or identify who supposedly heard this statement. Such gossip does not amount to admissible summary judgment evidence.

for Phillips's termination, not Hess, Lock's remark about Hess's alleged dislike is not probative of discrimination." *Id.* at 227. The other remark was also insufficient, standing alone, to establish substantial evidence of pretext. *Id.* In my view, Hildebrand's comments are virtually indistinguishable from Lock's comments in *Phillips*. As in *Phillips*, Hildebrand only described potential racial animosity in others, and she went even further by disclaiming any personal racial animosity.

Although *Phillips* is an unpublished decision, I find it highly persuasive given our repeated indications that the cat's paw theory requires the plaintiff to show that the employee personally held discriminatory animus. Hildebrand's comments are also readily distinguishable from the comments that we have considered in our published decisions to create a fact question as to animus. Recently, we considered a suit brought by an LSU police officer who claimed that a co-worker harbored misogynistic views because he had stated that he would resign his position if LSU appointed a woman as chief of police. *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 361 (5th Cir. 2013). We concluded that a reasonable jury could construe those remarks as demonstrating gender-based animus. *Id.* at 366. By contrast, Hildebrand's remarks do not reveal any personal animosity toward African-Americans. Moreover, Hildebrand's remarks do not suggest a similar *level* of animosity, as Hildebrand never suggested that she would not vote for a minority candidate *or* that she would resign if the Board selected a minority candidate.

In another gender discrimination case in which we applied the cat's paw theory, a supervisor responded to news of the plaintiff's pregnancy by becoming angry and noting that she would then have to pull management from other stores to cover the pregnant plaintiff's store. *Laxton v. Gap Inc.*,

333 F.3d 572, 583 (5th Cir. 2003). We concluded that "[i]t is reasonable to infer from [the supervisor's] negative reaction to the news of [the plaintiff's] pregnancy that she harbored a stereotypical presumption about [her] ability to fulfill job duties as a result of her pregnancy." *Id.* at 584. Again, the evidence in *Laxton* allowed an inference that the employee *personally* harbored discriminatory animosity, and no such inference is available here. Finally, this Court also found discriminatory animus as to age when one employee frequently referred to another as "old bitch." *Russell*, 235 F.3d at 226. Here again, the employee clearly held a personal animus.

It is obvious, when compared to these cases, that Hildebrand's remarks are significantly different, in both direction and degree. Hildebrand's comments are made in a different direction because they point to the potential animus of others, not herself. In each of our published decisions, the employee's comments or actions demonstrated that employee's *personal* animosity toward members of a protected group. Hildebrand's comments do not suggest that she harbored a negative personal opinion of African-Americans, and she actually suggested the contrary. Additionally, Hildebrand's comments, even if somehow attributed as her beliefs, are of insufficient degree to suggest animus. Unlike many of our cases, she did not use any epithets or hostile phrases to reference minorities. She also gave no indication that she would vote against or block all minority candidates. Her remarks, at most, indicate that she was skeptical that the community would favorably receive an African-American superintendent. Such a personal observation, standing alone, does not rise to the level of animosity under our precedent.

Nonetheless, given the racially-charged atmosphere that dominated the Board during this time and other comments from the African-American

7

Board members suggesting that Hildebrand harbored discriminatory views, I accept that the panel should allow this case to proceed to a jury. It is at least possible that Roque can ultimately produce admissible evidence to suggest that Hildebrand harbored racial animus. The panel's decision, however, should not be construed to reflect that the current record is sufficiently clear on this point.

### B.

Roque's evidence on the second prong of the cat's paw analysis is similarly weak. Our recent decision in *Haire* demonstrates the typical context in which an employee will have leverage or influence over an employment decision. There, the plaintiff was ultimately fired by the Chancellor of LSU, and there was no evidence to suggest that the Chancellor harbored any discriminatory views based on gender. 719 F.3d at 365–66. The Chancellor relied on a discriminatory employee, though, for critical information related to the alleged bases for the plaintiff's termination. *Id.* at 366–67. Thus, the cat's paw theory typically applies where the ultimate decisionmaker, the superior, relies on evidence or advice from a subordinate who harbors discriminatory animus. *Id.* at 366 n.11. The theory recognizes that the decisionmaker who makes an employment decision often lacks the personal information to make the decision and must instead rely on "performance assessments by other supervisors." *Staub v. Proctor Hosp.*, 131 S.Ct. 1186, 1192–93 (2011).

This case is not a typical cat's paw case because Hildebrand purportedly influenced six other co-equal members of the same Board. It does not appear to me that this Court has applied the cat's paw theory to a similar argument in a published opinion. A panel of this Court suggested in an unpublished opinion that the theory might apply in such cases, but it

declined to impute the potential biases of one member, even though that member was the chairman of a committee, to the other members of the committee without evidence that the biased member exercised a greater voice in the proceedings. *Russell v. Univ. of Tex. of the Permian Basin*, 234 F. App'x 195, 203–04 (5th Cir. 2007). Although I leave open the possibility that the cat's paw theory could apply in some cases where one member of a board has clear leverage or influence over the others, I would argue that we should be reticent to draw such an inference.

Roque admitted that the Board interviewed all the finalists, including him, and that all members were engaged, as "everyone around the table had questions for the candidates except Julia Hildebrand." Thus, it appears that Roque participated in the interview process, and the individual Board members had the opportunity to question the candidates. This suggests that the other members had the ability to exercise independent judgment in making their decisions.

There are three other items of evidence in the record to suggest that Hildebrand exhibited influence over the Board as a whole. First, Joella Wilson testified that Hildebrand presented the Board with some information about the candidates before the Board made the decision to re-open the application the process. Hildebrand chaired the search committee for the superintendent, and she apparently spoke to various people about several candidates. These comments apparently portrayed Roque in a negative light. Roque did not clearly raise this argument in support of his cat's paw argument in his brief, and thus he has probably waived it. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) (noting that an appellant waives all arguments that are not raised in his initial brief as well as those issues that are inadequately briefed). Even had Roque raised the issue, he has

offered little evidence to suggest that any Board member actually relied on these statements as a reason for making his or her hiring decision. *Cf. Gee*, 289 F.3d at 346–47 (finding that the plaintiff could defeat summary judgment with testimony from a committee member that he thought the decisionmaker had already made the decision at the meeting where a biased member made negative comments about the plaintiff). The second item of evidence is Ralph Wilson's testimony that Hildebrand met with Pam McAlexander, another Board member, and made negative comments about Roque. This item is weak, but it is probably enough to create a jury question because it at least shows that Hildebrand attempted to influence the decision of other board members.

Finally, Board member Harry Graham asserted that Hildebrand "took over" the meetings regarding the superintendent search. Roque has primarily relied upon this item of evidence to defeat summary judgment. The conclusory statements that Hildebrand "took over" meetings or "took charge" of the debate are probably insufficient, standing alone, to defeat summary judgment. *See Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) ("Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment."). Inexplicably, Roque's counsel did not follow up Graham's assertions with further questions to extract *how* Hildebrand took charge of the meetings, *whether* she actually told members how to vote, and *when* she had the opportunity to make such directives to the other members. A jury could infer from these comments, at most, that Hildebrand led the effort to re-open the application process, a fact also belied by the meeting minutes.

No. 14-30053

I would submit that we should rarely assume that other members of a co-equal Board act based on the invidious motives of another member. It would be especially inappropriate to do so absent evidence that Hildebrand supplied the *reasons* why the other white members voted to hire Duke over Roque. Evidence that the biased employee provided at least some of the reasons for the employment decision is necessary, not merely helpful, to creating an issue of fact under the cat's paw theory. This Court, in *Gee*, held that there was evidence of influence when a biased employee participated in a meeting on the plaintiff's job status, and another attendee said that he thought the decision was made in that meeting. 289 F.3d at 347. Tellingly, the decisionmaker in *Gee* also gave the biased employee's proffered reason as *his* reason for making the decision. *Id.* at 344–45. At best, the facts in this case provide a weak comparison to *Gee*. While there is evidence that Hildebrand chaired the search committee and that she presented some negative information about Roque to the Board, Roque has not yet presented specific evidence that suggests the white Board members relied on this information.

## III.

We have recognized at the summary judgment stage that the non-moving party need not reduce all its evidence to an admissible form. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Although it appears to me that much of the evidence is currently vague and relies heavily on speculation, I believe the panel has exercised appropriate caution by remanding this case to proceed with a trial. It does not appear to me, however, that Roque could sustain a defensible verdict at trial if he rested solely upon this feeble evidence. Indeed, plaintiffs seeking to raise claims based on the cat's paw theory should be cautioned to avoid similarly

11

speculative evidence as to either the animus or influence, particularly when such an employee purportedly influenced other co-equal members of a board.